IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SIDNEY L. COLEMAN and LAKESHA M. JOHNSON,

                  Plaintiffs,

    v.

DAVID J. COMPTON, TRACIE A. JOKOLA,
JAMIE GRANN, KYMTANA WOODLY,
KELLY L. BECKETT, BENJAMIN D. SCHWARZ,
MARK D. ALLEN, DAVE MERTZ, JEFF FELT,
MICHAEL G. MCEVOY, KELLY POWERS,
JERRY B. JOHNSON, DET. RILEY,
and ZACH HAGGERTY,

                  Defendants.

OPINION & ORDER

13-cv-765-jdp

Plaintiffs Sidney Coleman and Lakesha Johnson, appearing pro se, are jointly proceeding with claims that defendant Madison Police Department officers violated their Fourth Amendment rights in several ways in conjunction with the search of their motel room for a crime for which plaintiff Coleman was a suspect. Defendants have filed a motion for summary judgment, and plaintiffs have filed a motion for recruitment of counsel and motion for protective order to deny defendants' request to depose plaintiff Johnson.

After considering these filings, I conclude that there are disputed issues of material fact with regard to plaintiffs' claims that Coleman was seized without a warrant, Johnson was seized without probable cause or a warrant and subjected to a DNA swab, defendants searched the motel room, and defendants unreasonably pointed their guns at Johnson and plaintiffs' two-year-old child. I will grant plaintiffs' motion for recruitment of counsel and deny their motion for a protective order.

FINDINGS OF FACT

## A. Parties

Plaintiffs Sidney L. Coleman and Lakesha M. Johnson are both Madison residents.[1] The defendants were employees of the Madison Police Department (MPD). David J. Compton was a sergeant. Tracie A. Jokala, Jamie Grann, Kymtana Woodly, Kelly L. Beckett, Jerry B. Johnson, and Kathleen Riley were detectives. Michael G. McEvoy was an investigator. Benjamin D. Schwarz, Mark D. Allen, Dave Mertz, Jeff Felt, Kelly Powers, and Zach Haggerty were police officers.

## B. Stabbing investigation

On January 12, 2011, at about 5:00 p.m., MPD dispatch advised officers of a stabbing reported to have taken place at a gas station on South Park Street in Madison. Dispatch provided the following additional information: (1) the suspect was a black man, approximately six feet tall and weighing about 175 pounds, wearing a "funny-looking" winter hat, a blue t-shirt, and a black leather coat; (2) the suspect had fled in a black BMW; (3) a light-skinned black woman accompanied the suspect in the BMW; and (4) the victim was still at the scene and had been stabbed near his armpit.

Defendants Johnson, Beckett, Jokala, Grann, and Woodly went to the gas station. The gas station clerk told the officers that the suspect had stabbed the victim in the parking lot near a gas pump, using a knife that appeared to have a black blade.

Defendant Grann reviewed video surveillance of the incident with the clerk on an in-store monitor. The clerk pointed out the man he identified as the suspect. The suspect's

---

[1] Because there is more than one plaintiff, I will refer to each plaintiff by last name. Also, because there are two parties with the last name "Johnson," I will refer to them as "plaintiff Johnson" and "defendant Johnson."

vehicle appeared on the video, as did the woman who was with the suspect. Although defendants' proposed findings are not completely clear, they learned from either the clerk or the video that the suspect left the scene in a black two-door BMW, possibly a 1990s model, with a ragtop. The license plate was dirty and started with an "A."

Defendants Grann and Beckett returned to the police station, where they edited and emailed clips of the surveillance video, together with an incident summary, to other MPD officers. At about 8:30 p.m., Officer Jeff Pharo responded to Grann's email, stating that he had observed a similar car the previous evening, with occupants similar to those described in Grann's email. Pharo recalled that the vehicle had Alabama license plates that started with the letters "AZ."

Using a MPD database, defendant Jokala completed a query of vehicles that were similar to the suspect's vehicle. She discovered past MPD contact with a black 1998 BMW bearing Alabama license plate AZ38190. The vehicle was registered to Terrie Coleman of Alabama, who had a son named Sidney L. Coleman. Officers pulled up a booking photo of Sidney Coleman. MPD records showed that Coleman had a girlfriend named Lakesha Johnson. Defendants Beckett, Jokala, Grann, and Johnson all agreed that the photo of Coleman appeared to strongly resemble the suspect depicted in the digital footage from the gas station.

Defendants Johnson and Woodly went to UW Hospital and met with the victim in the emergency room at approximately 7:20 p.m. Woodly collected a DNA buccal sample from him. Johnson and Woodly learned that the victim had an arterial bleed in the area of his stab wound.

The victim told defendant Johnson what happened at the gas station. As the victim was walking inside to pay for gasoline, a black car almost hit him. He complained to the driver. The driver continued on and almost hit him a second time. In response, the victim hit the driver's side door and window of the car with his fist. The driver got out of the car and approached the victim. They threw punches at each other and then disengaged. The victim saw the suspect holding a knife. The suspect got back in the car and left the gas station. A few minutes later, the victim began to feel itching and pain coming from his left chest and armpit area. He noticed he was bleeding. He realized he had been stabbed, so he notified the store clerk. The victim said he did not know the suspect.

The victim described the suspect as a black man, about five-feet-ten-inches to six-feet tall, weighing between 120 to 135 pounds with a dark complexion and no facial hair. According to the victim, the suspect was wearing a black t-shirt and black pants and had short hair. The victim described the vehicle driven by the suspect as a black BMW two-door with a soft top and tinted windows. He believed the vehicle was a 2005 or 2006 model.

Defendants Johnson and Woodly returned to the precinct. Based on information gathered by defendants Grann, Beckett, and Jokala, Johnson assembled two sequential photo lineups including plaintiff Coleman that he intended to show to both the victim and to the gas station clerk. At approximately 9:50 p.m., defendants Johnson and Woodly showed the gas station clerk a sequential lineup with six photos. For five of the six photos, the clerk said the person shown was not the suspect. With Coleman's photo, the clerk said "It's possible, it's possible I'd have to look at the camera again to be sure, but he looks similar to the guy who was here." After the photo lineup was administered, the clerk told the detectives that at the time of the attack, the suspect wore a hat, a blue shirt, and a coat.

4

**C.  Search and arrest**

Defendants Grann and Beckett compiled a list of addresses used by plaintiffs Coleman and Johnson during past law enforcement contacts. They began searching several of these addresses as well as area parking lots for the BMW. Grann told defendants Johnson and Woodly that Coleman was known to have frequented area hotels. Johnson and Woodly joined the search.

At about 10:45 p.m., defendants Johnson and Woodly turned into the parking lot of the Road Star Inn on Seybold Road. There they saw an unoccupied black, two-door older model BMW with a soft top backed into a parking stall. Johnson walked up to the BMW and saw that the back plate read AZ38190, matching the car registered to Terrie Coleman. Johnson and Grann notified other officers that they had found the suspect's vehicle and advised them to come to the scene.

In response, multiple officers responded to the area of the Road Star Inn, including defendants Beckett, Jokala, Grann, Compton, Felt, Powers, Schwarz, and Mertz. Defendant Johnson showed the motel clerk a picture of plaintiffs Coleman and Johnson. The clerk told defendant Johnson that Coleman was currently a paying guest, but that he did not know whether there were any other people in the room. He showed the detectives the guest information/stay information sheet, which listed a "Sidney L. Green" as a guest in room 215, showed that he had checked in that morning, and listed only one adult. The signature for the room read "Sidney Coleman." The clerk showed defendant Johnson a photocopy of a Wisconsin identification card belonging to Sidney Lee Coleman.

Defendants state that they planned to have officers maintain surveillance on the BMW and wait for plaintiff Coleman to come to the parking lot before arresting him. But at

about 11:50 p.m., officers observed a black man walking in the parking lot near the BMW. Defendant Grann and others approached this person and briefly detained him until they determined that he was not Coleman. Because of this mistake, officers believed they had lost the element of surprise, and were concerned that Coleman had seen what had happened in the parking lot and might attempt to flee the motel, destroy evidence, or present a danger to others in his room. The officers decided to immediately proceed to room 215 and attempt to make contact with Coleman.

Defendants Johnson, Grann, Compton, Felt, and Mertz went to the room. Defendants Jokala and Beckett took positions near the rear of the motel in case Coleman fled in that direction. Defendant Woodly stayed near the BMW. Defendants Powers and Schwarz were positioned in the parking lot.

At about midnight, defendant Johnson knocked on the door of the room and announced the presence of Madison police officers. Plaintiffs say that Johnson yelled at Coleman to come out of the room, and that they were awoken by defendant Johnson's loud knocking and yelling. Coleman, wearing only a t-shirt and underwear, opened the door. All five of the defendants at the door pointed their guns at Coleman. Coleman was told to walk backward into the hallway toward defendant Johnson. Coleman was directed out of the room at gunpoint. Defendant Johnson handcuffed him.

Defendant Grann asked Coleman if there was anyone else inside the room. Coleman told him that his girlfriend and their two-year-old son were inside the room. Grann asked Coleman if officers could go inside the room to check for any other occupants and Coleman responded "yeah."

Defendant Compton ordered the woman, plaintiff Johnson, to come out of the room and she complied, exiting the room wearing what appeared to be the same shirt Coleman had been wearing on the surveillance video. Plaintiff Johnson states that to gain her compliance, all five of the officers present pointed their guns at her and forced her to face the wall. Plaintiff Johnson suffers from ADHD and mild mental retardation. She says that the officers "insisted" she come with them. Defendant Johnson asked plaintiff Johnson if anyone else was in the room and she stated that her two-year-old son was inside.

Defendants Mertz and Compton entered the room to perform a protective sweep of the room. Defendants say that Mertz and Compton had their guns drawn in a "low ready/tactical position" with the weapons pointed to the ground, pursuant to department procedures. They saw a child on the bed. Defendants say that as soon as they determined there was no threat to officer safety, they put their guns away, and did not point their guns at the child. Plaintiffs say that Mertz and Compton did point their guns directly at the child.

Because Coleman was only wearing a t-shirt and underwear, defendant Grann asked him if he wanted the officers to get him pants and a coat and he said he did. Defendant Compton asked plaintiff Johnson to get these clothes, and Johnson agreed. She walked into the room, picked up a pair of dark blue jeans that were lying across a chair and handed the jeans to Compton. Compton performed a cursory weapon patdown of them and felt a hard object in the back pocket. After manipulating the object for a moment, he thought the object was a folding knife based on its dimensions. Compton told defendant Johnson that he had discovered a folding knife in the pants. Defendant Johnson flashed his flashlight into the pocket and saw a black-handled folding knife. He was unable to see blood or biological evidence on it.

While in the room, defendant Johnson saw a dark leather-type jacket with white stitching hanging on the back of the chair. On the table, he saw a black baseball cap with furry flaps attached to it. He also saw food items on top of the microwave, including a bag shown as being purchased by Coleman on the gas station surveillance video.

Defendant Compton placed the jeans on the bed and asked plaintiff Johnson to find another pair of pants for Coleman. She proceeded to a duffel bag and removed a different pair of jeans. She also gave Compton a pair of high-top tennis shoes. Compton took these items into the hallway, and with the assistance of defendant Jokala, Coleman put on the pants and shoes.

Defendants Grann and Beckett escorted Coleman to defendant Schwarz's squad car and told Coleman that we would be taken to the South District police station for questioning. Grann asked Coleman if they could search the room for evidence, and Coleman said they could not. Plaintiffs say that defendant Mertz reentered the room anyway. After speaking with the district attorney's office, defendant Johnson decided not to take the pants and knife with them before getting a search warrant.

Officers asked plaintiff Johnson to come to the South Police District station along with her son to answer questions they had. Defendants say that plaintiff Johnson was not under arrest and that she agreed to go, but plaintiff Johnson states that they insisted she go and she felt that she had no choice. Plaintiffs say that Coleman told defendants about plaintiff Johnson's mental disabilities and pleaded with them not to question her. It is undisputed that plaintiff Johnson was not handcuffed.

Defendant McEvoy arrived after Coleman's arrest. He secured the motel room with a lock and hasp at about 2:00 a.m. McEvoy turned over the key to defendant Johnson.

**D. Questioning**

Coleman was taken to the South District police station and placed in a holding cell at about 1:00 a.m. The cell did not have a door that locks. Defendant Schwarz handcuffed Coleman's left wrist to a round bolt attached to a bench. Coleman says that he was handcuffed "in a very uncomfortable position" and felt pain when he tried to move. Defendants Haggerty and Allen guarded the door.

Coleman was removed from the holding cell from about 2:30 a.m. to about 3:20 a.m. for questioning, and was again handcuffed in the cell after questioning. Defendants Grann and Jokala questioned Coleman in an interview room. Coleman was restrained in handcuffs during the interview, but he was free to move about, which he did. Grann read Coleman *Miranda* warnings. Grann asked Coleman if he understood his rights as he had explained them to him, and Coleman responded "Yeah." Coleman agreed to talk to Grann and Jokala, and signed consent forms allowing police to search the BMW and the motel room. Coleman also verbally stated that they could search the car and room. Coleman was returned to the holding cell. At about 5:20 a.m., he was taken to the Dane County jail. Plaintiff spent no more than three hours and 25 minutes in the holding cell.

Plaintiff Johnson and plaintiffs' son were also taken to the South District police station. They initially sat together in a dimly lit interview room and were offered refreshments. The child went to sleep on the couch in the room. While plaintiff Johnson was questioned in a separate room, plaintiffs' son remained sleeping as defendant Powers stood by.

At about 1:40 a.m., defendants Grann and Jokala interviewed plaintiff Johnson, who was not restrained. Grann read plaintiff Johnson *Miranda* warnings. Grann asked plaintiff

Johnson if she understood her rights as he had explained them to her, and she responded "Yeah." Grann asked her if, having her rights in mind, she wished to speak to them, and she responded, "Yeah." Defendants say that plaintiff Johnson was cooperative and forthcoming during her interview. Plaintiff Johnson says that, particularly once she was separated from her son, she was worried and unfocused, and consented to whatever defendants asked so that she could get back to her son. Grann asked plaintiff Johnson if she would consent to providing a buccal sample. She consented. Grann read her the buccal sample consent form, which she signed. Plaintiff Johnson says that defendant insisted she sign the various consent forms. The interview concluded at about 2:00 a.m.

**E.  Search of the BMW**

While officers were inside the motel attempting to locate Coleman, defendant Woodly stood by the BMW. Defendant McEvoy later arrived at the parking lot and examined the outside of the car. McEvoy noted that a dusty layer of salt had two areas of "obvious disturbance": the driver's door had a pattern defendants believed was consistent with clothing materials rubbing against the salt, and the top right portion of the edge of the trunk appeared to have a partial handprint. Defendants had the car towed to an impound facility.

On January 13, 2011, defendants Beckett and Woodly searched the car. Beckett removed a purse and backpack containing children's clothing, which were taken to the South District police station. Woodly contacted plaintiff Johnson and arranged a meeting to give her those items the next day.

**F.  Search of the motel room**

At approximately 4:20 a.m. on January 13, 2011, defendants Grann, Jokala and McEvoy returned to the Road Star Inn to search the room pursuant to Coleman's consent. The search took about 20 minutes. The room was then turned back over to plaintiff Johnson. She consented to giving defendants the blue t-shirt she had been wearing, which defendants believed Coleman wore at the time of the stabbing.

**G.  Charges**

After the search of the room was finished, defendant Johnson completed a probable cause affidavit. At about 5:20 a.m. on January 13, 2011, defendant Johnson told Coleman that he was being charged with first-degree attempted homicide. Coleman was then taken to the Dane County jail. Coleman ultimately pleaded no contest to second-degree recklessly endangering safety, with a modifier for use of a dangerous weapon.

ANALYSIS

**A.  Summary Judgment**

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the

11

existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

After reviewing the parties' summary judgment materials, I will address plaintiffs' claims in a different order than I addressed them in the court's February 9, 2015, screening order, because the events flow more logically starting with defendants' decision to approach the apartment to arrest plaintiff Coleman.

### 1. Plaintiff Coleman's seizure

In the court's February 9, 2015, screening order, I explained that there were two components to plaintiff Coleman's Fourth Amendment claim regarding his arrest: (1) he was arrested without probable cause; and (2) he was arrested without an arrest warrant. Dkt. 26, at 5. Based on the undisputed facts about the surveillance video, the victim's identification of Coleman, and the match of Coleman's car, I conclude that defendants had probable cause to arrest plaintiff, so I will grant defendants' motion for summary judgment on this aspect of his claim.

But probable cause alone was not enough to make the arrest valid under the Fourth Amendment. Generally, police may not enter a person's home to arrest that person without an arrest warrant, unless exigent circumstances exist. *Payton v. New York*, 445 U.S. 573, (1980). "This constitutional protection of houses has been extended to other residential premises as well, including apartments, hotel and motel rooms, and rooms in rooming houses or hospitals." Wayne R. LaFave, 1 Search & Seizure § 2.3 (5th ed. 2012) (footnotes omitted); *see also United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987) ("A hotel room, as a temporary abode, is similarly protected from arbitrary searches and seizures.").

Defendants admit that they did not have a warrant to arrest Coleman. They raise three arguments in an attempt to defeat Coleman's *Payton*-style claim. Their first two arguments are related: they contend that Coleman voluntarily opened the door to the room, and that it is undisputed that he was arrested in the hallway of the motel, an area in which he had no reasonable expectation of privacy.

Neither of defendants' first two arguments is persuasive. Defendants do not develop their argument that plaintiff forfeited his privacy rights by opening his door, and legal authority refutes this position. "A person does not abandon [his Fourth Amendment] privacy interest in his home by opening his door from within to answer a knock." *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991). The real question is whether Coleman "submitted" or "acquiesced" to the seizure. *See Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991) ("If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent."); *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 690 (7th Cir. 2001) ("Without a warrant, this arrest could only be completed if [plaintiff] opened his screen door, and stepped outside of his home or acquiesced to a slight entry to complete the arrest.").

Whether an individual voluntarily consented to a search or seizure depends on "the totality of the circumstances" and relevant factors include: (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave consent; (4) whether consent was immediate, or prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether he was in police custody when he gave the consent. *United States v. Richards*, 741

13

F.3d 843, 848 (7th Cir. 2014) (applying *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973)).

The physical coercion factor is paramount in the analysis of Coleman's arrest. It is disputed whether defendants gave Coleman a chance to freely consent to his seizure. Coleman states that he opened the door to see several guns drawn on him, and defendants yelling at him to exit the room. Although Coleman did exit the room to be arrested, one reasonable inference is that he did so only because he was forced to at gunpoint.

Defendants' second argument about plaintiff being arrested in a public hallway is similarly flawed. The issue is not where Coleman was standing when defendants clasped handcuffs on him; the issue is where Coleman was *seized* for purposes of the Fourth Amendment. One reasonable view of the facts is that plaintiff was unlawfully seized while he was still standing in his motel room, when officers trained their guns on him and ordered him out of the room. *See* LaFave, *supra*, at § 6.1(e) (endorsing position that "warrantless doorway arrest was unlawful where the defendant submitted upon being confronted by several police brandishing guns" (citing *United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980)).

Defendants' third argument is that there were exigent circumstances to arrest Coleman without a warrant. The usual presumption against warrantless entry of a person's home can be overcome when police are faced with exigent circumstances making it "reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). Some examples of the types of circumstances meeting this standard are "hot pursuit," a suspect's potential escape, danger posed by the occupant to others, or the imminent destruction of evidence. *Id*.

14

But this exception to the warrant requirement is available only where the government carries the burden of "point[ing] to some *affirmative* sign of exigency." *United States v. Delgado*, 701 F.3d 1161, 1165 (7th Cir. 2012). Police "bear a heavy burden when attempting to demonstrate an urgent need that might justify" warrantless entry. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). Defendants fail to meet that burden here.

The circumstances creating the purported exigency were created by defendants' mistaken attempted arrest of another man in the parking lot.[2] They state that the mistaken attempted arrest near Coleman's room could have tipped him off to the police presence. I agree that Coleman *could* have been tipped off by the events outside, but this cannot in itself make the case for the warrantless arrest. Otherwise, the police could do away with the warrant requirement entirely, simply by running their sirens as they approach a house before making a warrantless arrest inside the home. Defendants provide no other affirmative sign of exigency, such as suspicious movements or other actions happening inside the motel room, leading to suspicion that a particular exigent circumstance was occurring. *See United States v. Etchin*, 614 F.3d 726, 733-34 (7th Cir. 2010) (police knocking on door seeking consent to enter cannot later "justify a warrantless entry based solely on the fear that evidence might be destroyed" absent "some other suspicious activity," such as "toilets flushing, a door slammed, people running, an obvious lie by the person answering the door, or efforts to remove contraband from the house.").

---

[2] The fact that defendants themselves created the exigent circumstances by botching the arrest in the parking lot does not necessarily doom defendants' argument. Police are allowed to act upon exigencies of their own making, so long as their conduct in creating the exigency was reasonable under the Fourth Amendment. *Kentucky v. King*, 563 U.S. 452, 468-70. Defendants did not violate Coleman's Fourth Amendment rights by mistakenly attempting to arrest the wrong person.

15

The only proposed finding of fact they offer on the subject is a statement that Coleman "might attempt to flee the motel, destroy or disrupt evidence, or present a danger to others in his room if he tried to barricade himself in there." But this is speculation on the part of defendants; they do not provide any *evidence* of the circumstances of this case that would lead to any of these particular exigencies. Therefore, I will not grant summary judgment to defendants based on their exigent circumstances argument.

Defendants also argue that they should be granted summary judgment on this claim because plaintiffs have failed to establish which of the defendants were personally responsible for unlawfully seizing plaintiff Coleman. Claims under 42 U.S.C. § 1983 require personal involvement in the alleged deprivation, though direct participation is not necessary. *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003); *see also Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) ("[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.").

Defendants are correct that plaintiffs' own proposed findings are vague about which defendants took each specific action they believed violated their rights. But the combination of both parties' findings provide enough detail to ascertain which of the defendants should remain in this claim. It is at least disputed whether each of the following defendants took part in executing the warrantless arrest of Coleman by going to the door of the motel room: defendants Johnson, Grann, Compton, Felt and Mertz. So plaintiff Coleman's claim may proceed against each of these defendants. Defendants Jokala, Beckett, Powers, Woodly and Schwarz arguably participated in the arrest by taking up positions around the motel itself during the arrest, so these defendants will remain in the case on this claim as well.

16

Plaintiff was also granted leave to proceed on this claim against defendants Riley, McEvoy, Haggerty, and Allen, but none of these officers were at the scene of the arrest and thus could not have participated in the constitutional violation, so I will grant defendants' motion for summary judgment on this claim as it relates to these defendants.

### 2. Plaintiff Johnson's seizure

I allowed plaintiff Johnson to proceed on three types of Fourth Amendment seizure claims: (1) she was seized without a warrant when she was taken to the police station for an interview; (2) she was seized without probable cause; and (3) she was forced to give a DNA sample. It is undisputed that there was no warrant or probable cause for Johnson to be arrested or to give a DNA sample.

The parties dispute whether plaintiff Johnson consented to go to the police station. She states that she "was forcefully demanded out of the room at gun point, by multiple officers. She was forced to face the wall and forced to go to the South District Precinct." Dkt. 66, at 24, ¶ 90. She states that all five of the officers present at the doorway pointed their guns at her. She characterizes these actions as an arrest, although it is undisputed that she was not handcuffed. Defendants call plaintiff Johnson's statement conclusory. Her statement is vague, but not fatally so; a reasonable inference from her statement and the surrounding facts is that a person in her shoes would not feel that she could say no to defendants' request given their show of force in entering the room, ordering her around, and locking her out of the room. Plaintiff Johnson also says that "[s]he suffers from ADHD and mild mental retardation, which wouldn't allow her to think or function properly under the intense circumstances," and that Coleman told defendants about these disabilities. Dkt. 67, at 3, ¶¶ 7-8. Plaintiff Johnson's mental capacity is another factor weighing in her favor.

I conclude that plaintiff Johnson's statements are sufficient to defeat summary judgment, although at trial she will have to be much more specific about exactly what defendants did to force her to go to the police station.

Plaintiff Johnson also brings a claim for being detained for the purposes of interrogation and the taking of her DNA. Johnson signed consent forms, although she says she did so because she was worried about her child, who was in a separate room, being taken away, and she has already described the circumstances leading her to believe that she had to comply with whatever the police requested. I conclude that defendants' motion for summary judgment will be denied about these aspects of her seizure claim as well.

Defendants again argue that plaintiffs have failed to identify which defendants were personally involved regarding these claims. But as I discussed above regarding Coleman's arrest, I conclude that there are sufficient facts to implicate defendants Compton, Johnson, Grann, Mertz, Felt, Jokala, Beckett, Powers, Woodly and Schwarz in the initial seizure of plaintiff Johnson. Defendants' proposed findings also show that defendants Grann and Jokala detained plaintiff Johnson for interrogation and that Grann took her DNA.

Plaintiff was also granted leave to proceed on this claim against defendants Riley and McEvoy, but the proposed findings do not show that these officials were personally involved in the seizures, so I will grant summary judgment to defendants Riley and McEvoy on these claims.

### 3.  Search of motel room

I granted plaintiffs leave to proceed on a Fourth Amendment claim against the defendant officers conducting searches of the motel room in conjunction with seizure of the

plaintiffs.[3] Defendants present a number of justifications for the searches connected to the seizure: they contend that Coleman initially consented to a search of the room, they were allowed to perform a protective sweep of the room, they were allowed to frisk the pants Coleman was going to put on, and they could remain present in the room to ensure that evidence was not tampered with. Their justifications are premised on Coleman's arrest being lawful and on Coleman's consent. But there are disputed issues of fact regarding both of these issues. As discussed above, I cannot conclude as a matter of law that Coleman was legally seized. If his arrest violated the Fourth Amendment, the ensuing searches could also violate the Fourth Amendment. *Huff v. Reichert*, 744 F.3d 999, 1009 (7th Cir. 2014). Additionally, there is a question of fact regarding Coleman's consent; a jury could conclude that Coleman was coerced into consenting at gunpoint.

Additionally, I allowed plaintiffs leave to proceed on claims that defendants "violated the Fourth Amendment by unnecessarily pointing their guns at them as well as their child during the search." Dkt. 26, at 4. Under the Fourth Amendment, the question is whether defendants' actions were "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). Factors used in making this determination include "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or

---

[3] Defendants use part of their briefs to assert the constitutionality of the searches of the motel room and BMW they performed after plaintiffs' questioning. In screening plaintiffs' complaint, I considered the search claims to be limited to searches performed at the time of plaintiffs' seizures. *See* Dkt. 26. Even if plaintiffs had brought claims regarding the subsequent searches, they would not be entitled to trial on those claims because the undisputed facts make clear that plaintiff Coleman gave defendants permission to search the motel room and the interior of the car.

others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id*. at 344 (quoting *Graham v. Connor*, 490 U.S. at 396).

Plaintiffs' proposed findings are extremely vague about how long defendants pointed their guns at them. Defendants contend that they are entitled to summary judgment on these claims because plaintiffs do not suggest that they continued to point their guns at plaintiffs after any threat of danger from plaintiffs had ended. I agree with defendants regarding plaintiff Coleman, because the risk of danger he posed was evident from the nature of the crime for which he was a suspect. Defendants were entitled to use the threat of force to arrest him, so I will grant summary judgment to defendants on this claim.

As for plaintiff Johnson, defendants contend that it was reasonable to point guns at her in the context of the protective sweep as they entered the room. But plaintiff Johnson was not suspected of a violent crime, and she alleges that all five of the officers present pointed their guns at her and forced her to face the wall. This raises an inference that defendants unreasonably continued to point their guns at her despite her not posing a threat. I conclude that there are disputed issues of material fact regarding defendants' treatment of plaintiff Johnson that will have to be resolved at trial.

Plaintiffs also allege that defendants Mertz and Compton pointed their guns directly at their two-year-old child. Defendants deny that this occurred (they state that their guns were "drawn in a low ready/tactical position with the weapons pointed to the ground"), but I must credit plaintiffs' version of events on summary judgment. Defendants' own explanation of how their guns would be drawn for a protective sweep (i.e., *not* directly at people during the sweep) suggests that it is not their practice to point their gun at any person they see in a room, and there would seem to be no reasonable justification for pointing a gun at a two-

20

year-old unless it was unintentional or if the officers only did so for a split second after sensing a person's presence as they entered the room. Plaintiffs do not explain why or how long defendants pointed their guns at their child, but from these facts, I cannot conclude as matter of law that defendants are entitled to judgment.

Defendants also argue that plaintiffs cannot maintain a claim regarding the child being threatened because the child is not a plaintiff and cannot be represented by his pro se parents. *See, e.g.*, *Elustra v. Mineo*, 595 F.3d 699, 705 (7th Cir. 2010) ("a next friend may not, without the assistance of counsel, bring suit on behalf of a minor party."). Defendants are correct, but I will not immediately dismiss this claim. As discussed below, I will be recruiting counsel to represent plaintiffs. I will allow plaintiffs to amend the complaint to include their child as a plaintiff provided that that request is made promptly.

As with the seizure claims, defendants argue that plaintiffs have not explained which defendants were personally involved in the searches in the motel room. But the parties' combined facts show that Grann sought plaintiff Coleman's consent, Mertz and Compton performed the protective sweep (and pointed their guns at plaintiffs' child), Compton patted down Coleman's pants, defendant Johnson recovered the knife from the pants, defendant Johnson and Compton visually searched the room, and Grann, Compton, Mertz, Johnson, and Felt pointed their guns at plaintiff Johnson. I will allow plaintiffs to proceed with their claims against these five defendants.

Plaintiffs were also granted leave to proceed on these claims against defendants Woodly, Riley, Schwarz, Beckett, Jokala, and McEvoy, but there are no proposed findings of fact linking these defendants to any of the searches, so I will grant defendants' motion for summary judgment on this claim as it relates to these defendants.

21

### 4.  Shackling

Plaintiffs alleged that defendant Schwarz handcuffed plaintiff Coleman to a brick bench in a holding cell for more than four hours, causing him pain and humiliation.[4] As I stated in the court's screening order, this claim falls under the Fourth Amendment because the alleged mistreatment occurred before a probable cause hearing. *See Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999). This claim is analyzed under the same "objectively reasonable" standard discussed above regarding defendants' use of guns. *See Graham*, 490 U.S. at 396-97.

Defendants approach this claim by arguing that it was reasonable to shackle plaintiff Coleman in the holding cell, as opposed to letting him roam free in a room without a lockable door. I agree as far as that goes; there is nothing unreasonable about shackling an arrestee accused of stabbing another person. But this alone is not dispositive, because Coleman's claim is based on *how* he was shackled.

The problem for Coleman is that he provides very little detail about why the manner in which he was shackled was unreasonable. He says only that he was handcuffed in a "very uncomfortable position, [and] felt pain everytime he tried to move." Dkt. 67, at 4, ¶ 10. Defendants explain that Coleman's left wrist was handcuffed to a round bolt on the bench. They have provided pictures of the room showing the position of the bolt and bench. Dkt. 41-1. Nothing from these pictures suggest that handcuffing a suspect's left wrist to the bolt would be inherently harmful, and plaintiff Coleman's vague proposed findings do not sufficiently explain what about the shackling caused him pain.

---

[4] The undisputed facts show that the total amount of time plaintiff Coleman spent handcuffed in the holding room was about three hours and 25 minutes. This difference from his allegation of the total time handcuffed being over four hours is not material.

Nor does Coleman state that he complained to defendant Schwarz or either of the officers guarding the cell, defendants Haggerty and Allen, so that they would know that he was suffering from discomfort or pain. Even if Coleman had complained, he would have had to provide more than the type of generalized complaints of discomfort or pain that the Court of Appeals for the Seventh Circuit has generally not considered sufficient to violate the Fourth Amendment. *See, e.g.*, *Rabin v. Flynn*, 725 F.3d 628, 636 (7th Cir. 2013) (defendant officers "are entitled to qualified immunity because there is no evidence that Rabin specifically made them aware of his medical history, and his other generalized complaints of pain are insufficient to show excessive force."); *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) ("At most, the record shows that Mr. Stainback said that he did not want to be handcuffed because he thought it would hurt and that Mr. Stainback complained generally about pain after he was handcuffed. These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that Mr. Stainback would be injured by these actions.").

As the Seventh Circuit has repeatedly stated, "summary judgment is the 'put up or shut up' moment in the life of a case." *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 612 (7th Cir. 2008). This was plaintiff Coleman's opportunity to explain why he believed that defendants violated his rights with regard to his shackling. Coleman's vague statements are not sufficient to raise a reasonable inference that defendant Schwarz or anyone else acted unreasonably in keeping him shackled in the holding cell. Accordingly, I will grant summary judgment to Schwarz on this claim.

### 5. Impoundment of car

Plaintiffs brought a claim that defendant Woodly ordered the BMW to be towed, which resulted in plaintiff Johnson not receiving her purse and personal items that were in the car for two days. However, the undisputed facts here show that Woodly did not violate the Fourth Amendment by impounding the car.

Police may seize a car without a warrant "when they have probable cause to believe it contains evidence of criminal activity." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). "Probable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *Id*. (internal quotation marks omitted).

Similar to the discussion above regarding probable cause for plaintiff Coleman's arrest, I conclude that there was probable cause to seize the BMW. The surveillance video and victim's identification gave good reason for defendants to think that Coleman had committed the stabbing and that the BMW was at the scene of the crime. And defendants' undisputed observations about marks on the car show that the victim may have left a handprint on the car. Because Woodly had probable cause to seize the car, I must grant summary judgment to defendants on this claim.[5]

---

[5] If plaintiff Johnson means to argue that defendants *retained* her property for too long after seizing the car, the Fourth Amendment is not the proper source of claim—such a claim might be brought under the due process clause of the Fourteenth Amendment or state conversion law. *See Lee v. City of Chicago*, 330 F.3d 456, 466-68 (7th Cir. 2003). But Johnson does not develop an argument for how such a short deprivation—about two days—could support this type of a claim, and I am aware of no precedent suggesting that she could prevail on that claim. *See United States v. Johns*, 469 U.S. 478, 487-88 (1985) ("we conclude that the warrantless search three days after the packages were placed in the DEA warehouse was reasonable and consistent with our precedent involving searches of impounded vehicles.").

### 6. Qualified immunity

As discussed above, the following Fourth Amendment claims survive defendants' substantive arguments for summary judgment:

- Plaintiff Coleman was arrested without a warrant;

- Plaintiff Johnson was seized without a warrant or probable cause, and was subjected to a DNA swab;

- Defendants searched the motel room pursuant to unlawful seizures of plaintiffs; and

- In performing searches and seizures, defendants pointed their guns at plaintiff Coleman and plaintiffs' child.

Defendants argue that plaintiffs' claims should be dismissed under the doctrine of qualified immunity. "[Q]ualified immunity protects government agents from liability when their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citations and internal quotation marks omitted). In deciding whether a right is "clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The doctrine allows "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (internal quotation marks omitted).

A plaintiff bears the burden of establishing that the constitutional right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

"In other words, 'the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right.'" *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quoting *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005)).

As is common in pro se litigation, plaintiffs do not present a point-by-point rebuttal of defendants' qualified immunity defense for each of the claims discussed above. But the Fourth Amendment is well-trod ground. Plaintiffs correctly point to *Payton* as clearly established law regarding warrantless arrests of suspects in their abode, and much of the remaining claims flow from the question whether the initial seizures of plaintiffs were reasonable. The other major issue with regard to most of these claims is consent, which is also a well-developed area of the law. It is also clear that there are limits to how officers may reasonably use their guns as a show of force during a search. At this point, the parties have provided proposed findings from which I could reasonably infer violations of clearly established law. It is possible that further development will show a set of facts under which qualified immunity might apply, but for now I cannot determine as a matter of law that qualified immunity should apply to any of plaintiffs' claims. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial.")

## B. Counsel

Plaintiffs previously moved for the court's assistance in recruiting counsel at the outset of the case, Dkt. 13, which the court denied that motion as premature, Dkt. 15. Plaintiffs have now renewed their motion. Dkt. 74. I will grant the motion because I conclude

that counsel would be helpful to assist with the logistical difficulties inherent in having two pro se plaintiffs living in different places (plaintiff Coleman is incarcerated, plaintiff Johnson is not) preparing for trial. The presentation of plaintiffs' case at the trial itself will also be greatly helped with the assistance of counsel. As discussed above, plaintiffs and counsel will be given a chance to amend the complaint to include the claim regarding the show of force toward plaintiffs' child. The court will set a new schedule following recruitment of counsel.

## C. Deposition of plaintiff Johnson

Plaintiffs filed a motion for protective order to deny defendants' request to depose plaintiff Johnson, stating that defendants' goal is to "take advantage of her mental disabilities" and is thus in bad faith. Dkt. 68. Defendants note that plaintiff Johnson has not sought to been ruled incompetent or otherwise unable to present testimony, and indeed has presented her own written testimony in support of plaintiffs' opposition to summary judgment. I will deny plaintiffs' motion because defendants have the right to depose their opponents. If they so choose, they will be allowed to depose plaintiff Johnson before trial. Because I am recruiting counsel for plaintiffs, she will be represented at that deposition.


ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 38, IS DENIED with respect to the following Fourth Amendment claims:

   - Defendants Johnson, Grann, Compton, Felt, Mertz, Jokala, Beckett, Powers, Woodly, and Schwarz unlawfully arrested plaintiff Coleman without a warrant.

   - Defendants Compton, Johnson, Grann, Mertz, Felt, Jokala, Beckett, Powers, Woodly and Schwarz unlawfully arrested, detained, and performed a DNA swab of plaintiff Johnson.

- Defendants Grann, Mertz, Compton and Johnson unlawfully searched the motel room.

- Defendants Grann, Compton, Mertz, Johnson, and Felt unreasonably used force by pointing their guns at plaintiff Johnson and plaintiffs' child.

2.  Defendants' motion for summary judgment is GRANTED in all other respects. Defendants Riley, McEvoy, Haggerty, and Allen are DISMISSED from the case.

3.  Plaintiffs' motion for recruitment of counsel, Dkt. 74, is GRANTED. A new schedule for resolution of the case will be set after counsel is located.

4.  Plaintiffs' motion for protective order, Dkt. 68, is DENIED.

Entered June 7, 2016.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge